73 F.3d 370
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Mark E. SMITH, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner of Social Security,
Defendant-Appellee.
 No. 94-55685.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 17, 1995.
Decided Dec. 29, 1995.
 
 1
 Before: HALL and NOONAN, Circuit Judges, PRO,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 * Mark Smith is a 53-year-old biological female who presents himself to the world as a man. He has had both breasts surgically removed and prefers being referred to by masculine pronouns. Because of personality, affective, and anxiety disorders, the Social Security Administration determined that he was disabled in November 1968. He started receiving Social Security Disability benefits then and SSI benefits in 1977.
 
 
 4
 In 1981, Smith's disability benefits were terminated even though he was still disabled. Pursuant to a class action suit all of the benefits he had been receiving in 1981 were reinstated. See Lopez v. Heckler, 572 F.Supp. 26 (C.D.Cal.1983). This hiatus in benefits meant that for a year he was without any income. Because he had no source of income, a vocational counselor helped Smith apply for a civilian Aircraft Electrician position with the Navy apprenticeship program at the Naval Air Rework Facility. He began the program on April 4, 1982, and received $1200 per month as an apprentice. The apprenticeship was a four-year program with the goal of producing qualified aircraft electricians. He was an apprentice from April 1982 until January 1984 when he was suspended from the base. The Navy formally terminated him in September 1984.
 
 
 5
 During the first six months of the apprenticeship (from April to about September 1982) Smith, along with the other apprentices, attended classes eight hours a day. Smith testified at the hearing before the Administrative Law Judge ("ALJ") that teachers from Alameda Junior College came to the base and taught the apprentices the same classes they taught at the junior college, such as industrial math, beginning drafting, beginning physics, technical English, and trade theory. He also testified that sometimes the teachers did not have enough material to fill the classes, so he and the other apprentices could do whatever they wanted--play cards or do crossword puzzles.
 
 
 6
 From approximately October to December 1982 Smith and the other apprentices attended a trade theory class four hours a morning. In the afternoon they were supposed to go into the shops for electrical training. But Smith testified that he and the other apprentices did not get to work in the electrician shops for another three months. Instead he was sent to a receiving room where he unpacked boxes and then followed the person who delivered the equipment to the different shops. Not until January 1983 did Smith and the other apprentices work in the shops.
 
 
 7
 There is conflicting testimony whether the work that Smith and the other apprentices engaged in was meaningful when he began to be trained after January 1983. At the hearing before the ALJ, Smith testified that none of the apprentices were allowed by the electricians to do "real" electrician journeyman work. According to Smith, the electricians resented the apprentices, the majority of whom were female, and did not want to take the time to train them or give them much to do. Smith testified that he sometimes swept the floor, sorted or washed parts, or filled out order forms. He told the ALJ that most days he was in the shop "there wasn't anything they gave me to do, but occasionally they would give me something." When he was absent, no one filled in for him because he had no regular duties or responsibilities.
 
 
 8
 On the other hand, Smith reported in a vocational report he wrote in the spring of 1984 that he "tore down, repaired, reworked, and rebuilt 3-phase military aircraft generators, using mechanical, air-powered, and electrical tools and test equipment. I rebuilt electric actuators, ran connector system cables working from schematics, and checked, spliced, and rewrapped and potted wires and connectors on aircraft." Smith now contends that when he wrote that vocational report he was suicidal and was trying to get back into the apprenticeship program from which he had been suspended in January 1984.
 
 
 9
 Whatever Smith's actual activities, the apprenticeship program's stated expectation was that during the first year the apprentices would take four hours to do the work a trained electrician could complete in one hour--a 25% level of proficiency. But Smith testified that he never approached that level of proficiency because the electricians would not let him do any electrician journeyman work.
 
 
 10
 Smith also testified that he did not perform as well as the other apprentices. For example, he explained that a journeyman electrician took two weeks to train him to "put a clip on something," but Smith later saw this journeyman teach another apprentice how to do the same procedure in a day. And while none of the apprentices did meaningful apprentice work, Smith needed and got more supervision than the other apprentices. As he put it, doubtless hyperbolically, "They didn't let the apprentices do very much, but they said I needed more supervision. Sometimes they would have a dozen people standing around me watching me."
 
 
 11
 Smith's evaluations show he performed well in the apprenticeship program at first but at some point began causing disruptions and acting out. A January 1983 evaluation rated Smith as an excellent worker, although it noted that he "tends to misinterpret other personnel's situations that don't pertain to him." Although the record is not clear on this point, it appears that at some point the other students learned that Smith is a woman. Having his actual gender known apparently made Smith extremely sensitive to remarks about gender and made him feel as if he were constantly being sexually harassed.
 
 
 12
 One (undated) memo from an instructor stated, "For the first six months of training, Mark Smith was an ideal student. I was absent from the training program for about four months for medical reasons. However when I returned in May '83 Mark Smith's behavior change [sic] drastically. During the last six to eight months I have had to write some sore [sic] of memorandum dealing with numerous problems with Mark Smith."
 
 
 13
 A July 20, 1983, memorandum from a supervisor described another incident with Smith. Smith shouted at two students, and the instructor ordered him out of the classroom. The instructor managed to calm him down, but the other students in the class remained upset by Smith's outburst. Smith apparently carried a tape recorder in his briefcase, and the other students disliked being taped. The students feared that Smith was dangerous and would get violent. They said his behavior was getting "worse". The instructor also noted that he arranged his lectures to accommodate Smith's disruptions.
 
 
 14
 In January 1984, Smith was suspended from work because of his disruptions and inability to work. In February 1984 the Navy sent him a letter that "proposed his removal" because of his harassment of coworkers and managers, refusal to follow orders, insubordination, and disruptive behavior. Rather than firing him, the Navy ordered him to seek counselling with a recommended therapist.
 
 
 15
 One of the therapists he saw expressed the opinion that only with a great deal of accommodation and a very understanding manager could Smith perform essential functions of his position without endangering others. Another psychiatrist, Dr. Lowinger, stated in a letter to the Navy that Smith had been suicidal for several months and had been hospitalized in May 1984 for that reason. Smith felt angry and alienated and thought he was being sexually harassed. Smith pointed to a March 1982 medical examination by someone who appeared to be a doctor for the Navy that confirmed Smith was a woman and not a man. Dr. Lowinger did not believe that Smith could be returned to work even with accommodation because of a "Generalized Anxiety Disorder."
 
 
 16
 In August 1984 Smith was terminated from the apprentice program because of his "psychoemotional condition which renders [him] permanently impaired and prevents [him] from functioning within the parameters of [his] position."
 
 
 17
 After his termination from the program Smith once again collected disability payments until November 1990, when the Social Security Administration sent him notice that his disability had ceased in April 1982 because he had been engaged in substantial gainful activity during the Navy apprenticeship. Smith cannot reapply for disability benefits because the Navy did not pay into the Social Security system during his apprenticeship. Therefore, if Smith's disability did cease during the period he was employed by the Navy, then he is permanently barred from receiving disability and Medicare benefits. Because Smith is unable to work, and has been since 1968, the loss of these benefits is a substantial hardship.
 
 
 18
 The issue on appeal is whether the ALJ's determination that Smith's period of disability ceased because he was engaged in substantial gainful activity from April 1982 through January 1983 is supported by substantial evidence and is not based on legal error.
 
 II
 
 19
 Smith suffers from a long-term disability that was first recognized by the Social Security Administration in 1968. He is entitled to continue receiving the benefits he was allotted in 1968, provided he has not engaged in substantial gainful activity ("SGA") since 1968. To find that Smith's disability terminated during his Navy apprenticeship, the court must find that he engaged in SGA for at least six months before he was dismissed. A short-term period of employment (less than six months) that is terminated because of the claimant's continuing disability is considered an "unsuccessful work effort," and does not terminate a period of eligibility for disability payments. 20 C.F.R. Sec. 404.1574(a)(1); Social Security Ruling 84-25.
 
 
 20
 During his final year of employment Smith suffered severe emotional problems that disrupted his ability to do his job, and that eventually led to his dismissal from the program. The record includes a great deal of evidence tending to suggest that Smith was not engaged in SGA during that period. The ALJ focused on Smith's employment from April 1982 to January 1983, and made no explicit findings regarding his final year of employment. See Decision of Dept. of Health and Human Services at 3-4 ("ALJ Opinion ") ("The record contains evidence that at least up to January 1983, the claimant performed his work competently and efficiently"). The ALJ based his finding of SGA on the facts that Smith earned substantial income from his job, he worked 40 hours per week, and his work performance was satisfactory during the initial nine months. ALJ Opinion at 6.
 
 
 21
 To qualify for disability benefits, a claimant must prove he or she is unable to engage in substantial gainful activity because of a "medically determinable physical or mental impairment [that is] expected ... to last for a continuous period of not less than 12 months." 42 U.S.C. Sec. 423(d)(1)(A). The regulations define substantial gainful activity as "activity that involves doing significant physical or mental activities," and is "usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. Sec. 404.1572. Furthermore, the regulations state that some activities are generally not considered gainful activities: "Generally we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." Id. (emphasis added).
 
 
 22
 Average monthly earnings in excess of $300 establish a rebuttable presumption that a person is engaged in substantial gainful activity. 20 C.F.R. Secs. 404.1574(b)(2) & 416.974(b)(2). To determine the salary attributable to substantial gainful activity, the regulations specify that only salary earned through work attributable to the worker's productivity is to be considered. 20 C.F.R. Sec. 404.1574(a)(2). Any salary not attributable to the worker's productivity may be considered an employer subsidy and is not included in the SGA analysis. Id.; see also Soc.Sec.Ruling 83-33 at 96 ("it is necessary to ascertain what portion of the individual's earnings represents the actual value of the work he or she performed").
 
 III
 
 23
 Because Smith earned a salary of $1200 per month, that establishes the presumption that he engaged in SGA. Smith contends, however, that he rebutted the presumption because his work during his apprenticeship was not productive and, thus, his income attributable to SGA fell below the regulatory presumption of $300 per month. Because we agree that Smith adequately rebutted the presumption, we remand for further proceedings.
 
 
 24
 For the first six months of his apprenticeship Smith attended classes all day. School attendance is not generally considered to be SGA because it is not productive work, therefore, Smith's salary for this first six months does not indicate that he performed SGA.
 
 
 25
 The ALJ did not find that Smith's classroom work was in any sense productive. The ALJ merely concluded that because classes were a part of the Navy's apprenticeship program, and because Smith had the title "employee," was paid a substantial salary for attending classes, and was employed for 40 hours per week, therefore, Smith's class attendance was SGA. The ALJ made no findings explaining why 40 hours per week of class attendance falls outside the regulation stating that school attendance is generally not considered SGA. Furthermore, he failed to assess whether all or part of Smith's salary should have been considered an employer subsidy. Because the ALJ did not find that Smith's salary during this period was in any way related to his productivity, the ALJ's conclusion that Smith was engaged in SGA during the first six months was based on legal error.
 
 
 26
 From October 1982 through January 1983, Smith attended classes for four hours in the morning and did makework activities in the afternoon. It appears that little of Smith's $1200 per month salary during this three month period was attributable to his productivity. The ALJ did not find otherwise. As the ALJ put it, "Overall, the claimant does not appear to have been very productive." That is an understatement that undermines the ALJ's conclusion. The salary attributable to his classroom attendance in the morning does not indicate Smith was engaged in SGA because school attendance is generally not considered SGA. The salary attributable to his activities in the afternoon does not indicate Smith was engaged in SGA because Smith was not being paid to do productive work. Instead the salary he received was subsidized, at least in part.
 
 
 27
 Katz v. Secretary of HHS, 972 F.2d 290 (9th Cir.1992), in which this Court found that a secretary whose employer made accommodations in her work conditions and who cut down on her responsibilities was engaged in SGA is instructive to why Smith's activities were not. Crucial to the court's conclusion in Katz was evidence showing that the work she did was worth to her employer the amount she was paid. Id. at 293-94. Here, however, there is no evidence that Smith earned the salary he was paid. Indeed, the evidence and the ALJ's finding that overall Smith was not very productive point to the conclusion that Smith did not earn his salary. Because evidence that Smith's salary was related to his productivity and was not subsidized is necessary to support the ALJ's determination that Smith was engaged in SGA, the ALJ's conclusion that Smith was engaged in SGA during this period is not supported by substantial evidence.
 
 
 28
 Upon remand further findings are required as to whether Smith engaged in substantial gainful activity during his final period of employment. If he did not engage in six months of substantial gainful activity during the Navy apprenticeship, then the court must find that this was an unsuccessful work effort, which did not terminate his continuing disability. In that event, the court must reinstate Smith's disability benefits.
 
 IV
 
 29
 Because the Administrative Law Judge's conclusion that from April 1982 through January 1983 Smith was engaged in SGA was based on legal error and was not supported by substantial evidence, we REVERSE the Administrative Law Judge's decision finding Smith not disabled on this basis and REMAND to the District Court for further proceedings consistent with this disposition.
 
 
 
 *
 The Honorable Philip Pro, United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3